Good morning. My name is Jessica Wellman from the Federal Defenders of Montana, and I represent David Toro Chase in this matter. I'd like to reserve two minutes of my time for rebuttal. May it please the Court? Because Mr. Chase could not afford to hire an attorney in this case to determine the drug cost. You know, it said, I was looking at the sheets here, and it said, retained. An attorney, it said retained. I wondered about that. At the beginning, when this matter proceeded, Mr. Chase had a retained counsel. And he was no longer able to afford the counsel, so the Court appointed a counsel for him. So at that point, he had appointed counsel, and because he couldn't afford to hire an expert or an attorney to determine the drug quantity, Mr. Chase is now spending more time in jail because that I'm trying to keep your voice up. Because that information was so important to the judge to determine. A little louder, please. Just project your voice, you know. Yes, Your Honor. All right. Good. Mr. Chase is spending more time in jail because of the two possible methods of determining the drug quantity in this case. The judge determined using the most productive possible method. He's using the spending more time in jail because the district court considered unreliable evidence, and the evidence was unreliable from the government's forensic expert. The Court erred in the method of determining the drug quantity, and the Court abused its discretion in failing to court to appoint an expert in this matter. Counsel, the counsel below was very good in eliciting information from the government's expert. The lawyer did an excellent job. I don't think it was you below, was it? No, it was not. It was a man. What could an expert have done? What additional information could have been elicited that wasn't? Well, the one thing that an expert could have done was to rebut the government's witness. And given the extreme difference in the methodologies that were possible here, there is no information on the record about what was the most reliable method. The district's, or rather, the government's expert never gave that information about what was most reliable. And he didn't do that because he didn't look at the totality of the circumstances. A government or an expert for the defense would have, in fact, looked at all the circumstances. The government expert didn't know that there were precursors found in the amount of 100 pseudoephedrine boxes. But that was brought up at the trial, and the information was provided, and the government's expert said, yes, normally I would rely on these precursors and empty boxes. So that information was before the judge. Right. But even when that information was brought up, there was no determination of what method, given that now he knew that there were precursors. He was, in fact, told at the sentencing hearing by the defense counsel that there were precursors found. And given that information, the expert did not give any opinion, when specifically asked. He didn't give any opinion about which was more reliable, given the fact that in this case, there were no weights or volumes of any of the chemicals that were found. In this case, there was evidence that it was quite likely that the largest container that was used, the 5,000-milliliter flask, that Mr. Chase never, in fact, even used that. That's a triple-nick flask. That is part of the trouble in the case. And so even here, they don't ---- Any of the utensils? There was ---- It was never tested to find out if there was a trace. Never tested. So the expert did not know if there was any methamphetamine found in the flask. But there was evidence that it appeared that it was found in its original packaging, suggesting that it was never used and there wouldn't have been a trace found. I'm talking about the other items there in the lab. There were other items of glassware found, and in some of those, there's some evidence that there were traces of drugs and different chemicals found in it. But those chemicals, they were never weighed or measured, so we don't know how much was actually found in those vessels. Okay. Why don't we hear from the government? From the government? Yes. Good morning. May it please the Court. My name is Josh Van de Wetering. I'm an assistant United States attorney from Missoula, and I handled at least portions of this case below, although my colleagues handled some portions of it also. There was no clear error in Judge Malloy's conclusion that the government ---- Everybody guessed. Everybody was guessing. Isn't that pure error? I wouldn't ---- The judge didn't know how much narcotics was present. You didn't know how much was present. The defendant didn't know how much was present. Isn't that pure error? No drugs were found there either. There were no drugs found there. Yes. So this is a drug-no-drug case. This is a no-drug case. That's absolutely correct, Your Honors. And there's no way for anyone ---- Well, what reason would there be for not allowing some sum of money? How much did he ask for, for an expert? I'm not sure he asked for any particular sum of money. No, he asked for funds to hire an expert. He was indigent. Why should he have to rely on the government's expert, who was guessing anyway? And the reason in this case, Your Honor, is the government's expert gave all of the possible ---- Oh, well, I mean, you have to rely on the opposition expert to help you out. Is that what it's all about? I don't ---- I certainly wouldn't suggest that as any kind of general rule, Your Honor. But I would say in this case ---- That's what happened here. I would respectfully disagree with that, Your Honor, in this respect, that in this case, the ---- there is no information that will help get to a clearer number that an expert can provide. We don't know that. We don't know that because your expert was only guessing. I would say this, Your Honor. He, our expert, was taking all the information that was available in the case. Was he guessing or was he positive? He was not guessing, Your Honor. He was positive regarding the information that he had. But it is clear that he did not ---- The information that he had, but he didn't have all the information. I think he did have all the information. By the time defense counsel crossed him and asked him to make new calculations based on suppositions or evidence that was found, I think an expert, the government's expert, did everything an expert could do in this case. I think where this case runs into a problem or the frustration that we're all having is there is no fixed number that we can hang our hats on. There isn't an amount of methamphetamine that was found that really can represent what happened in the lab because, of course, the lab had been used and everything was gone. Counsel, the government's expert was relying on the amount of glassware there to make the approximation. But we need to find that there was some indicia of reliability to support that approximation. Other than the fact that there was glassware there, what indicia of reliability could we find that would support his calculation? I would offer two ways, Your Honor. We know for sure that there were two labs that happened at three locations. I don't think it's really even disputed that there were two labs. And that's based on the kinds of glassware found, various other materials, that there was some trace material on some of those things. And there was no trace material found on the 5,000 milliliter triple-neck flask. So the expert did a number of different calculations. He did a calculation based on simply how much could the lab produce based on that 5,000-neck flask. That's the 500 or more gram conclusion. However, even on cross-examination, he was given by Mr. Glazer, the defense lawyer down below, a series of hypotheticals or a series of questions based on the evidence found. And one of those questions was, is it accurate to say that it's around 40 to 60 grams of found? And the expert, the government expert, agreed that, yes, that would be approximately accurate. 40 to 60 would be reasonable. So I would suggest even putting aside the 5,000-milliliter flask, we know that this lab was running for months at a time. On just this one location, it was running for months. The other lab, where 109 grams was found, was running for months. Well, how do you know it's running for months or it's not? There didn't seem to be any evidence or any specific evidence supporting that there were different cooks, I think they were calling them, each month. That that was just guessed at by the district court. What supports that determination? And I'm sorry, Your Honor, I don't have that record right at my fingertips. I'm recalling that the lab was up and running. This lab was up and running from, I think, about August or fall through June or something like that. And I don't recall what it is in the record that demonstrates, it may be a witness who said that the lab was up and running for that period of time, but you're correct, we don't have any witness who says there were 10 cooks in that period or 25 or any particular number. But I would offer this, it would be unreasonable to think that in that period, with people who are acknowledged methamphetamine addicts, that they would cook only the one time. And I think Judge Molloy flat rejected the idea that the lab had been used only one time. So the question becomes, what's a reasonable estimate based on the length of time we know they're up and the size of the lab, even assuming the defendant's 42 grams. And even at 42 grams per cook, plus the 109 grams, a total of 350 grams is a very conservative low-end estimate, which is what Judge Molloy, I think, ultimately concluded. What was the reason for denying the request, the appointment of a defense expert? Well, Judge Molloy issued an order, Your Honor, that said that he did not consider the 5,000 milliliter flask, and therefore, and that's the reason. What was the reason for not granting the motion to hire for the defendant to get his own expert? Well, I think Judge Molloy's order, Your Honor, said that the reason was that he wasn't considering the 5,000 milliliter flask, and that's why he denied the motion in the first place. But I would suggest also that the government's expert, again, provided all the numbers and calculations with all the information that any expert could, and I don't think the defendant has ever really shown that. Well, you think every expert that takes the stand is... I'm sorry, Your Honor, I didn't... You think the experts that take the stand are totally impartial? I think there is impartial, certainly, I think this expert was impartial as a human being can be. I don't think he has an extra grant in this case, and I think all the information he offered is really based on calculations. If you have X amount of... Who does the expert work for? I beg your pardon, Your Honor? Who does he work for? He works for the DEA lab in San Francisco. And I wouldn't suggest that he's without his bias altogether. But I don't see... I would suggest there's nothing, there's no reason in the record to think that another expert would give some other number. And I don't think even the defense opposes the numbers that the government expert came up with on that cross-examination portion when he was asked to recalculate based on different assumptions instead of using the flask. So in light of that, I don't think Judge Malloy's decision was wrong to deny an expert because there's nothing an expert could have. What is your burden in proving the amount of... Our burden, Your Honor, is a preponderance of the evidence. Preponderance of the evidence? Yes, Your Honor. So therefore, you have to have somebody who testifies to create the preponderance. Exactly, Your Honor. Which means a defense expert. I would suggest, Your Honor, that the government's expert and the rest of the information in the case... You used the word preponderance. Now what does the word preponderance mean in a civil or criminal lawsuit? More likely than not. More likely than not? And I would suggest, Your Honor, that between the government's experts, the rest of the information... We sentence people because it's more likely than not likely? Well, Your Honor, that's how we arrive at the drug calculation. I don't think the defendant is contesting his guilt at all. And certainly this Court directs that caution be exercised when calculating drug amounts. But I would suggest Judge Malloy's going to the bottom end of all the calculations in this case serves that requirement very well. So I would suggest that Judge Malloy has not clearly erred. All the calculations were based upon could have been. There is no way to get at an absolute definite. How do you evaluate that words could have been? Your Honor, I would respectfully disagree that the calculations are based on could have been, but are more like more... Well, the calculations are based on could have beens that are from the evidence. So the only thing we're left with, or the real question mark, is how many times were cooks made? Even using the defendant's lowest number of 42 grams per cook, the United States would suggest that over a period of eight months, plus the other lab, a low number, an estimate, a low number estimate of 350 grams is... So how long had the lab been under surveillance? The lab had been under surveillance not very long, Your Honor. I think the investigation was going on a period of weeks before they finally broke into the lab. And it's from other witnesses that we learned that they had been up and running at this location for that period of eight months. They didn't wait until there was a cook going on? You know, when they hit these labs, you're always, I guess in some respect, hoping for a lucky break that you'll find a lot of the material there. But it would only be that, a lucky break, to be able to have that sort of information. Because, of course, when they're done cooking, they use or distribute the methamphetamine. And we're left with a case like this where it's impossible to say exactly how much this particular lab produced. And that's why I think this circuit has agreed that a finding based on the glassware is a legitimate way to make an estimate of the drug amount a defendant is responsible for. And I see my time is up. So unless there are other questions. Thank you. All right. Thank you. Rebuttal. Thank you. I would only add that the expert in this case did his job. He admitted that he found the greatest possible amount of methamphetamine he could find using the medical method that he used and the information he had. But he never answered the important question about whether it was reliable or not, based on the evidence that you had here and the questions that you were talking about. And the judge specifically noted, Judge Malloy specifically noted, when he was sentencing, at the sentencing hearing, that the expert was skeptical. He noticed that the expert was skeptical about the 40 grams, the amount used from the precursor method, and the judge went along with the expert's finding. Had there been a defense expert in this case, he would have another opinion to look at in determining whether or not that was, in fact, reliable based on the circumstances here, the amount of time the lab was running, and those elements. Counsel, what do you say about opposing counsel's point that even if it's only 40 grams, if the lab was up and running for that amount of time, that's still a conservative estimate? The defendant admitted, in fact, that he did cook more than one time. But what he said, and the evidence bears out, at least in the fact that the largest flask was not used, is the fact that he did several cooks, at least seven cooks, but for much smaller amounts. He was feeding his own drug habit. He couldn't have access to the precursors that were necessary. And there wasn't any record, evidence in the record, that would suggest that he could get that, those precursors. The only evidence was there that someone did sometimes buy him the pseudoephedrine, but that was only a couple boxes at a time. And here you would need, you know, immense amounts more to get to the amount that the expert talked about in this case. Suppose you have two experts, one for the government, one for the defense, and neither one of them can testify exactly how much drugs were manufactured by the defendant. And they both were giving an estimate based upon their experience as experts. Who was the trial judge supposed to believe? Or are you supposed to believe anybody? How does the trial judge in that case sentence somebody based upon a quantity of drugs being manufactured? Your Honor, in these cases where the judge almost has to guess, and the experts themselves are almost having to guess, the standard is clear that the judge has to look for an indication of reliability, and they have to go with the most conservative amount. And so if you have two judges here, they're both reliable, they're both using the scientific method that's appropriate, the judge has to go with the most conservative amount. You're saying that in that case, then, the government has the burden of proof, and if the government didn't meet its burden of proof, the defense expert has to prevail. Is that what you're saying? If the government's expert doesn't prove by a preponderance of the evidence, yes, the defense expert would have to prevail, but most importantly, the government or, rather, the judge has to look at what's the most conservative method and the most conservative amount. Thank you. How much would it have cost for the defense to have hired an expert? I believe that the lawyer said that it would be $1,000 to have an expert testify telephonically, to hire, to do all the work, and to testify at the sentencing hearing. So it would be $1,000 that the act would allow the government or the judge to allow. Thank you. Thank you. Thank you. Okay, this matter is submitted. Now, item number three is also submitted. That's U.S. v. Gonzales Romero and Carlos Alberts.
judges: Pregerson, Ferguson, Ikuta